1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| GUSTAVO FERNANDEZ,<br><br>                    Petitioner,<br><br>          v.<br><br>G. J. JANOA,<br><br>                    Respondent. | Case No. CV 12-10291 JC<br><br>MEMORANDUM OPINION AND ORDER DENYING OPERATIVE FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS AND DISMISSING ACTION WITH PREJUDICE |

## I.     SUMMARY

On January 4, 2013, Gustavo Fernandez ("petitioner"), a state prisoner proceeding *pro se*, filed the operative First Amended Petition for Writ of Habeas Corpus by a Person in State Custody ("Petition") pursuant to 28 U.S.C. § 2254 with attached exhibits.  Petitioner challenges his conviction in Los Angeles County Superior Court on multiple grounds.

On June 6, 2013, respondent filed an Answer and a supporting memorandum ("Answer").[1]  On August 16, 2013, petitioner filed a Reply.

///

---

[1]Respondent concurrently lodged multiple documents ("Lodged Doc."), including the Clerk's Transcript ("CT") and the Reporter's Transcript ("RT").

1

1    The parties have consented to proceed before the undersigned United States

2    Magistrate Judge.

3    For the reasons stated below, the Petition is denied, and this action is

4    dismissed with prejudice.

5    **II.    PROCEDURAL HISTORY**

6    On July 1, 2010, a Los Angeles County Superior Court jury found petitioner

7    guilty of first degree murder (count 1), conspiracy to commit first degree murder

8    (count 3), and assault with a semiautomatic firearm (count 4).[2]  (CT 220-22, 224-

9    25; RT 2716-20).  The jury also found true allegations that (1) in the commission

10   of counts 1 and 3, a principal personally and intentionally discharged a firearm

11   which proximately caused the death of Ricardo Favela; and (2) all three crimes

12   were committed for the benefit of, at the direction of, or in association with a

13   criminal street gang.  (CT 220-22, 224-25; RT 2716-20).

14   The trial court sentenced petitioner to a total of 64 years to life in state

15   prison.  (CT 283-84, 287-90).

16   On December 5, 2011, the California Court of Appeal affirmed the

17   judgment in a reasoned decision.  (Lodged Doc. 3).  On March 14, 2012, the

18   California Supreme Court denied review without comment.  (Lodged Doc. 5).

19   On September 9, 2013, petitioner signed a habeas petition which he

20   formally filed in the California Supreme Court on September 18, 2013.  (Lodged

21   Doc. 8).  On January 15, 2014, the California Supreme Court denied such petition

22   with a citation to People v. Duvall, 9 Cal. 4th 464, 474 (1995).[3]  (Lodged Doc. 9).

23   ───────────────

24   [2]The jury found petitioner not guilty of the attempted murder of J.M. (count 2).  (CT 224;
     RT 2718).

25

26   [3]The Ninth Circuit has read the California Supreme Court's denial of a habeas petition
     with a citation to Duvall as, in effect, the grant of a demurrer, *i.e.*, a holding that the petitioner

27   did not plead facts with sufficient particularity.  Cross v. Sisto, 676 F.3d 1172, 1177 (9th Cir.
     2012) (citations omitted).  Claims rejected under Duvall may or may not be exhausted depending

28   (continued...)

### III.    FACTS[4]

On August 8, 2007, Ricardo Favela, also known as ("aka") "Hunter" ("Favela"), was fatally shot while standing next to his friend J.M. on the sidewalk near the intersection of Eighth and Oxford Streets in Los Angeles, an area claimed by the Aztlan criminal street gang ("August 8 shooting"). J.M., who had lived in the neighborhood for more than 10 years, was 15 years old at the time of the shooting. J.M. had been "jumped" into the Aztlan gang at 12 years old but did not want to be in the gang and did not associate with it. Favela would hang out with Aztlan gang members.

At the time of the August 8 shooting, petitioner, aka "Maniaco" or "Maniac," and Gerson Barillas, aka "Corrupt" ("Barillas"), were members of the Mara Salvatrucha criminal street gang ("M.S.") – a rival gang which operated in a neighborhood six to eight blocks away from the Aztlan claimed area.

The instant case stems from the trial and conviction of petitioner and Barillas for the August 8 shooting.

///

---

[3](...continued)

upon whether they were fairly presented to the California Supreme Court with as much particularity as practicable. See Kim v. Villalobos, 799 F.2d 1317, 1319 (9th Cir. 1986). Although the parties disagree on the matter (Compare Docket No. 42 with Docket No. 46), it appears to the Court that petitioner's state habeas petition fairly presented to the California Supreme Court with as much particularity as practicable, petitioner's sole claim asserted therein, i.e., that his trial counsel was ineffective in failing to obtain a gang expert to testify on behalf of the defense, and thus that such claim is exhausted. To the extent petitioner intends to assert such claim herein, this Court rejects it both because it is untimely (as explained in Docket No. 36), and because the Court, after conducting a de novo review, finds it to be without merit as petitioner fails to demonstrate either that his counsel was deficient or that there is a reasonable probability that, but for counsel's alleged deficiency, the result of the proceeding would have been different. See Strickland v. Washington, 466 U.S. 668, 686-94 (1984).

[4]Unless otherwise indicated, the facts set forth in this section are drawn from the California Court of Appeal's decision on direct appeal. (Lodged Doc. 3 at 3-9). Such factual findings are presumed correct. 28 U.S.C. § 2254(e)(1).

3

**A.     Prosecution Evidence**

**1.      The August 8 Shooting**

At approximately 5:45 p.m. on August 8, 2007, J.M. and Favela were approached by two males as they were walking north on Oxford Street near where it intersected with Eighth Street.  The shorter male (identified as petitioner) appeared very nervous and looked around suspiciously.  The taller of the two (identified as Barillas) stood next to petitioner.

Barillas asked, "Where are you from?"  Favela responded by flashing his "gang sign" – a hand signal in the shape of an "A" which was meant to represent the Aztlan gang.  J.M. responded that he "wasn't from nowhere."  During the exchange petitioner appeared nervous and "kept on looking around" in the manner of a lookout.

Barillas then identified himself as an M.S. member, and petitioner pulled up his shirt to reveal a black handgun in his waistband.  J.M. and Favela "froze" in place.  Neither one drew a weapon.  Barillas, who was about four to five feet away, pulled the gun out of petitioner's waistband and cocked it, said "Mara Salvatrucha controlar aquí,"[5] shot Favela in the chest, and then "flashed his gang sign, M.S."  Petitioner stood by and continued to look around.  Barillas also shot at J.M.  J.M. tried to run, but tripped, fell, and "blacked out."  Upon opening his eyes, J.M. saw Barillas and petitioner running away around the corner of Eighth Street onto Western.

Favela died from a gunshot wound to his chest.  J.M. was not wounded, but there were two bullet holes in his baggy white T-shirt.

A few hours later, Mario Monroy ("Monroy") was in his apartment eight or nine blocks from the scene of the shooting with petitioner (whom Monroy knew as Maniac or its Spanish equivalent, Maniaco) and two other M.S. members.  Monroy

---

[5]The statement means "Mara Salvatrucha controls here."

was on "house arrest" at the time.[6]  Although petitioner was an M.S. member, Monroy was not.[7]  Monroy heard petitioner speaking to one of the other gang members, whom Monroy knew as Psycho about "a shooting on Oxford." Petitioner said "some other guy" shot the victim because "he didn't have the strength to do it."  He also heard petitioner say the victim was a member of the Aztlan gang.

### 2.    The Investigation

Detective Edward Ruffalo responded to the scene of the August 8 shooting. He found three shell casings on the ground that were from a nine-millimeter Lugar.

Detective Teodoro Urena ("Urena") interviewed petitioner two times in connection with his investigation of the August 8 shooting.  The first interview took place on November 21, 2007 at the police station and was videotaped. During the first interview, petitioner, among other things, waived his Miranda[8] rights and admitted being an M.S. member, but denied any involvement in the August 8 shooting.

Approximately 40 minutes later, Detective Urena conducted a second, audiotaped interview with petitioner as they drove from the police station to a juvenile detention center.  During the interview, petitioner stated the following: He admitted taking part in the shooting, which was an M.S. "job."  Higher ranking M.S. members had instructed petitioner to carry out the job because "he hadn't put

///

---

[6]When Monroy testified at the preliminary hearing, he was in custody, having been charged with rape.  He was also on probation for felony vandalism.

[7]On cross-examination, Monroy testified that he was a member of M.S. in 2008, but he was subsequently "jumped out" of the gang.

[8]Miranda v. Arizona, 384 U.S. 436 (1966).

in any work for the gang."[9]  The August 8 shooting was carried out as retaliation for two prior incidents involving rival Aztlan gang members.  Specifically, seven months earlier, petitioner saw five or six persons, including Favela, "tagging" a wall with graffiti near petitioner's home.  When petitioner challenged them, and claimed the area as M.S. territory, Favela shot petitioner in the shoulder.  Also, approximately four weeks before the August 8 shooting, an Aztlan gang member purportedly attacked a member of the M.S. gang's Normandie clique.

M.S. gang members who planned the August 8 shooting included "Chino," "Little Man," and "Demon."  "Corrupt" (a member of the M.S. gang's Hollywood "clique") was also present during planning, and was the actual shooter.  Two M.S. gang members (*i.e.*, "Sospechoso" and "Mysterioso") "scout[ed] the area" in a red vehicle looking for Aztlan gang members, and used a phone or radio to communicate the location of intended targets.  On the day of the shooting both petitioner and Corrupt carried handguns; "Little Man" had given petitioner his weapon.

Petitioner was present when Corrupt approached, challenged, and shot Favela.  Shortly after the shooting, Corrupt pistol whipped petitioner on the side of the face and other gang members punished petitioner with a "courtesy beating" because petitioner had failed to do the shooting as planned.  Thereafter, the M.S. gang had no further contact with petitioner.

### 3.    Other Gang Evidence

#### a.    Detective Lamas' Testimony

At petitioner's trial, Detective Claudia Lamas ("Lamas") testified to the following:  She specialized in gang crimes and was familiar with the M.S. criminal street gang.  While on patrol on August 16, 2007, she met petitioner who claimed

---

[9]Petitioner said that younger or newer gang members were expected to do "work" and "carry out a mission or a job" for the gang.

membership in M.S. and said his moniker was El Maniaco.  On April 8, 2006, Lamas stopped Barillas who said that he had been a member of M.S. for two years and that his moniker was "Corrupt."  On July 27, 2006, Barillas again admitted that his moniker was Corrupt, but said he had been an M.S. gang member for four years.

### b.    Officer Marquez's Testimony

Officer Hector Marquez, the prosecution's gang expert, testified to the following:  He was personally familiar with the M.S. criminal street gang and its cliques operating in the Wilshire Division.  There were approximately 200 M.S. gang members in that area.  Gang members will typically have juvenile members hold their weapons because juveniles are treated more leniently in the court system.  Younger members are expected to "put in work" for the gang, and if they fail to do so, they might get kicked out of the gang or face a 13-second "beat down" by other gang members.  It is expected that a younger member will take responsibility for criminal acts committed with older members.  Officer Marquez personally knew that Barillas was an M.S. gang member called "Corrupt";  He did not know of anyone else with the same moniker.  The August 8 shooting occurred in a neighborhood that was claimed as Aztlan territory.

In response to a hypothetical question which included facts consistent with the prosecution evidence, Officer Marquez opined that (1) the August 8 shooting was committed for the benefit of the M.S. gang since the shooters had entered rival gang territory and shot a member of that rival gang; (2) one possible motive for the shooting was to extract revenge for a prior knife attack on M.S. by the Aztlan gang; (3) in M.S. culture, such a knife attack was considered a sign of disrespect, and failure to seek revenge for the attack would be perceived as weakness; and (4) committing acts of violence against a nearby rival gang would help M.S. increase its influence in the area and further expand its territory.

///

On cross-examination, Officer Marquez testified that if a younger gang member was given a mission to shoot someone and he failed to carry it out, it would hurt the gang's reputation.  Such a gang member would suffer some kind of punishment, "probably get beat up."  Failure to take part in a gang-ordered shooting would be considered one of the worst kinds of disrespect in gang culture. It was very "severe" and could result in a "death warrant," depending on the situation.  On redirect examination, the expert testified that he would not expect that a young, inexperienced gang member would be killed in circumstances like those in which petitioner failed to shoot Favela – he more likely would just receive a beating.

### c.     Detective Urena's Testimony

Detective Urena testified at petitioner's trial as an expert on gang culture. He explained that the more missions a member does for his gang – and the more violent those missions are – the greater that member's status will be within the gang.  Conversely, a new member is expected to do something for the gang.  If a new gang member does not put in an adequate amount of "work" within several months after joining a gang, the other gang members will begin to ostracize that member.

In the prosecution's rebuttal case, Detective Urena testified that a current gang member could leave M.S. by being "jumped out" of the gang in the same manner as being "jumped in" to join the gang (*i.e.*, submit to a 13-second beating by other M.S. gang members).

### B.     Defense Evidence

Petitioner testified in his own defense to the following:  He was 16 years old at the time of the shooting.  He came to the United States from Honduras two years earlier.  He was "jumped in" to M.S. eight or nine months before the August 8 shooting and had the gang moniker "Maniaco" or "Maniac."

///

8

1   On August 8, 2007, petitioner left home between 4:00 p.m. and 5:00 p.m.
2   and walked to Eight Street and Normandie where he met fellow gang members
3   who instructed him "[t]o shoot somebody."  An M.S. member called "Little Man"
4   said to shoot an Aztlan gang member.  Petitioner felt pressured to follow the older
5   M.S. members' orders, even though he did not want to (he had never hurt anyone
6   before), because he was scared that if he refused "they would shoot [him]" or kill
7   his family.  He took the gun from Little Man only out of fear.  Petitioner knew that
8   he and Corrupt were going to shoot Favela.

9   Petitioner put the gun into his waistband and went out with Corrupt, who
10  had a .357 caliber handgun.  When the two encountered a rival gang member,
11  Corrupt asked where "he was from?"  After the rival answered, Corrupt told
12  petitioner to shoot him.  Petitioner refused, and instead pulled the gun out of his
13  waistband and pointed it to the ground.  Corrupt then took the gun from petitioner.

14  After hearing the gunshots, petitioner ran home, where he stayed until he
15  was arrested because he feared that M.S. gang members might kill him or beat him
16  or his family members.  Petitioner had previously been warned that an M.S. gang
17  member who failed to follow orders from older M.S. members would face dire
18  consequences.

19  Petitioner recalled being shot during an incident that occurred
20  approximately a month and a half before the August 8 shooting.  He did not
21  remember whether it was Favela or another person who shot him.  Petitioner also
22  recalled a stabbing incident between members of Aztlan and M.S.  Both incidents
23  prompted the older M.S. gang members to order petitioner to shoot Favela.

24  ## C.   Pertinent Closing Argument

25  In closing, petitioner's counsel argued that petitioner was not guilty because
26  petitioner had withdrawn from the conspiracy before the shooting and had acted
27  out of duress – specifically, petitioner testified that (1) he did not want to go on
28  the "mission" to shoot somebody; (2) he took the gun and went along with Corrupt

out of fear; (3) when Corrupt made the gang challenge to Favela, petitioner drew the gun, but kept it at his side and told Corrupt that he could not shoot; and (4) Corrupt took the gun from petitioner and shot Favela himself. (RT 2226-34). Petitioner's counsel rejected the prosecutor's contention that petitioner could not have acted under duress since he could have "jumped out" of the gang if he wanted to avoid committing acts of violence.

In rebuttal, the prosecutor argued that it strained credulity to believe that petitioner was unaware of the gang's expectations during the nine months petitioner was an M.S. member. If petitioner was truly opposed to committing acts of violence, he could have left the gang (*i.e.*, by submitting to a 13-second beating by other gang members). As for the duress defense, the prosecutor argued that (1) there was no evidence petitioner received a direct threat of violence from any M.S. member; (2) there was no evidence that petitioner "believe[d] his life [was] in immediate danger"; (3) petitioner did not testify as to when he thought the fatal retribution would come; and (4) any belief by petitioner that he faced such retribution would be unreasonable.

## IV.  STANDARD OF REVIEW

This Court may entertain a petition for writ of habeas corpus on "behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). A federal court may not grant an application for writ of habeas corpus on behalf of a person in state custody with respect to any claim that was adjudicated on the merits in state court proceedings unless the adjudication of the claim: (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or (2) "resulted in a

///

///

10

1  decision that was based on an unreasonable determination of the facts in light of

2  the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).[10]

3       In applying the foregoing standards, federal courts look to the last reasoned

4  state court decision.  See Smith v. Hedgpeth, 706 F.3d 1099, 1102 (9th Cir.), cert.

5  denied, 133 S. Ct. 1831 (2013).  "Where there has been one reasoned state

6  judgment rejecting a federal claim, later unexplained orders upholding that

7  judgment or rejecting the same claim rest upon the same ground."  Ylst v.

8  Nunnemaker, 501 U.S. 797, 803 (1991) (cited with approval in Johnson v.

9  Williams, 133 S. Ct. 1088, 1094 n.1 (2013)); Cannedy v. Adams, 706 F.3d 1148,

10  1158 (9th Cir. 2013) (it remains Ninth Circuit practice to "look through" summary

11  denials of discretionary review to the last reasoned state-court decision), as

12  amended on denial of rehearing, 733 F.3d 794 (9th Cir. 2013), cert. denied, 134 S.

13  Ct. 1001 (2014).

14  **V.   DISCUSSION**[11]

15       Liberally construed in light of petitioner's briefing on direct appeal, the

16  Petition appears to assert that the trial court erred under state law and deprived

17  petitioner of his federal constitutional rights when it (1) refused petitioner's

18  request to instruct the jury on the defense theory that a duress defense could be

19  based on "fear of great bodily harm"; and (2) permitted Detective Urena to provide

20  expert testimony regarding an issue about which he was not qualified to opine and

21  for which opinion testimony was not needed.  (Petition at 5; Reply at 6-14; see

22

23       [10]When a federal claim has been presented to a state court and the state court has denied

24  relief, it may be presumed that the state court adjudicated the claim on the merits in the absence
    of any indication or state-law procedural principles to the contrary.  Harrington v. Richter, 562

25  U.S. 86, 99 (2011); see also Johnson v. Williams, 133 S. Ct. 1088, 1094-96 (2013) (extending

26  Richter presumption to situations in which state court opinion addresses some, but not all of
    defendant's claims).

27

28       [11]The Court has read, considered and rejected on the merits all of petitioner's contentions.
    The Court discusses petitioner's principal contentions herein.

Lodged Doc. 1 at 16-41).  Petitioner is not entitled to federal habeas relief on either claim.

### A.  Petitioner's Jury Instruction Claim Does Not Merit Habeas Relief

Petitioner appears to claim, as he did on direct appeal, that the trial court erred under state law and denied him a meaningful opportunity to present a complete defense when it refused to modify CALCRIM No. 3402 (Duress or Threats) to permit a duress defense based on petitioner's fear of "great bodily harm" (not just fear that his life was in danger).  (Petition at 5; Reply at 7-10; see Lodged Doc. 1 at 16-28).  The California Court of Appeal – the last state court to render a reasoned decision on the issue – rejected petitioner's claim on the merits. (Lodged Doc. 3 at 9-14).  Petitioner is not entitled to federal habeas relief on this claim.

### 1.  Background[12]

The trial court granted petitioner's request to instruct the jury with CALCRIM No. 3402 (Duress or Threats) as to count 2 (attempted murder), count 3 (conspiracy), and count 4 (assault) regarding the affirmative defense of duress.[13]  California Penal Code section 26 – upon which CALCRIM No. 3402 is based – provides, in pertinent part, that "[a]ll persons are capable of committing crimes except . . . [¶] [p]ersons (unless the crime be punishable with death) who committed the act or made the omission charged under threats or menaces sufficient to show that they had reasonable cause to and did believe their lives would be endangered if they refused."  Cal. Penal Code § 26(6).

---

[12]Unless otherwise indicated by citation to the record, the facts set forth in this section are drawn from the California Court of Appeal's decision on direct appeal.  (Lodged Doc. 3 at 10-12).  Such factual findings are presumed correct.  28 U.S.C. § 2254(e)(1).

[13]Under California law, duress is not a defense to crimes punishable by death.  See People v. Anderson, 28 Cal. 4th 767, 780 (2002) ("[Cal. Penal § 26(6)] preserves the common law rule that duress is not a defense to murder"), habeas corpus denied, 2008 WL 1849787 (N.D. Cal. Apr. 3, 2008).

1
2
3
4

At trial, petitioner argued that California law permitted, and the evidence presented at trial supported giving a modified version of CALCRIM No. 3402 that allowed the jury to find duress if petitioner acted out of fear that he would suffer "great bodily harm" if he refused gang demands to commit the crimes.

5
6
7
8
9
10
11
12
13
14

Petitioner asked the trial court to give a modified version of CALCRIM No. 3402 that would have allowed the jury to find duress if it concluded that petitioner had acted out of fear that he would suffer "great bodily harm" if he refused gang demands to commit the crimes.  (CT 119-20) (citing People v. Otis, 174 Cal. App. 2d 119, 124 (1959)).  During discussions with the trial court, however, the parties focused primarily on whether a defense of duress was available for conspiracy to commit murder and whether petitioner had presented substantial evidence to support the proposed instruction.[14]  There was no reported discussion regarding petitioner's proposed language regarding fear of great bodily harm.[15]  (RT 1907-14).

15
16

The trial court denied petitioner's proposed modification, and instead instructed the jury with the following version of CALCRIM No. 3402:

17
18
19

[Petitioner] is not guilty of  attempted murder charged in count two, conspiracy to commit murder, count three, or assault with a deadly weapon in count four if he acted under duress.

20
21
22
23

The defendant acted under duress if . . . because of threat or menace, he believed that his life would be in immediate danger if he

24
25
26
27

[14]Petitioner's counsel argued that a duress defense was available because petitioner testified that "he was afraid he would be killed," and it was reasonable to believe that such "an extremely violent gang" would "have the facility" to kill petitioner immediately for refusing the older gang members' orders.  The prosecutor initially argued there was no substantial evidence of an express or implied threat, but eventually agreed that the instruction should be given on all counts other than murder.

28

[15]The trial court and counsel apparently had prior unreported conferences in chambers.

1  refused a demand or request to commit the crimes.  The demand or

2  request may have been express or implied.

3      The defendant's belief that his life was in immediate

4  danger must have been reasonable.  When deciding whether the

5  defendant's belief was reasonable, consider all the circumstances

6  as they were known to and appeared to the defendant and

7  consider what a reasonable person in the same position as the

8  defendant would have believed.

9      A threat of future harm is not sufficient; the danger to life

10  must have been immediate.

11      The People must prove beyond a reasonable doubt that the

12  defendant did not act under duress.  If the People have not met

13  this burden, you must find the defendant not guilty of attempted

14  murder, conspiracy to commit murder, and assault with a deadly

15  weapon.

16      This defense does not apply to the crime of murder

17  charged in count one.

18  (CT 218; RT 2129-31).

19          **2.    Pertinent Law**

20      Claims of error concerning state jury instructions are generally matters of

21  state law that are not cognizable on federal habeas review.  See Gilmore v. Taylor,

22  508 U.S. 333, 344 (1993); see also Menendez v. Terhune, 422 F.3d 1012, 1029

23  (9th Cir. 2005).  Federal habeas relief is available for such claims only when a

24  petitioner demonstrates that a trial court's instructional error violated due process.

25  Estelle v. McGuire, 502 U.S. 62, 72 (1991); see also Waddington v. Sarausad, 555

26  U.S. 179, 191 (2009) (same) (citations omitted); Middleton v. McNeil, 541 U.S.

27  510, 520-21 (1979) (jury instruction violates due process if it fails to give effect to

28  requirement that State prove every element of the offense) (citations omitted).

14

1    An ambiguous, inconsistent, or otherwise deficient jury instruction violates

2    due process only when there is a "reasonable likelihood that the jury has applied

3    the challenged instruction in a way that violates the Constitution." Middleton v.

4    McNeil, 541 U.S. at 437 (internal quotation marks and citations omitted).  It is not

5    enough that there is some "slight *possibility*" that the jury misapplied an

6    instruction.  Weeks v. Angelone, 528 U.S. 225, 236 (2000) (emphasis in original).

7    Federal habeas relief is available only when "[an] ailing instruction by itself so

8    infected the entire trial that the resulting conviction violates due process."

9    Waddington, 555 U.S. at 191 (citations omitted).  A petitioner has an "especially

10   heavy burden" to establish a due process violation predicated on "[a]n omission,

11   or an incomplete instruction" since such errors are "less likely to be prejudicial

12   than a misstatement of the law." Henderson v. Kibbe, 431 U.S. 145, 155 (1977).

13   A challenged instruction must be evaluated in the context of other instructions and

14   the trial record as a whole, not in artificial isolation.  Waddington, 555 U.S. at 191

15   (citations omitted).

16   Where a state court has rejected an instructional error claim on the merits,

17   federal habeas relief may be granted only if the state court's application of the

18   foregoing law was objectively unreasonable.  Waddington, 555 U.S. at 190

19   (citations omitted).  Since the due process standard applied to claims of

20   instructional error is a very general one, the range of possible reasonable

21   applications of that standard is substantial, and thus significant deference is given

22   to state court adjudications of such claims.  See generally Yarborough v.

23   Alvarado, 541 U.S. 652, 664 (2004) (in assessing whether state court's

24   adjudication of claim involved unreasonable application of clearly established law,

25   court must consider legal rule's specificity; the more general the rule, the more

26   leeway courts have in reaching outcomes in case-by-case determinations); see,

27   e.g., Moncada v. Smalls, 2012 WL 3150596, *6 (C.D. Cal. Mar. 22, 2012)

28   (affording court of appeal's adjudication of instructional error claim

1  "considerabl[e] leeway" since the governing Supreme Court rule for analyzing

2  such claims is "particularly general"), report and recommendation adopted, 2012

3  WL 3149150 (C.D. Cal. July 31, 2012).

4      Contrary to petitioner's assertion otherwise (Reply at 10), errors in jury

5  instructions, for the most part, and as pertinent here, are subject to harmless error

6  analysis under Brecht v. Abrahamson ("Brecht"), 507 U.S. 619 (1993).  See

7  Hedgpeth v. Pulido, 555 U.S. 57, 60-62 (2008).

8          **3.    Analysis**

9      Here, petitioner is not entitled to federal habeas relief on his jury instruction

10  claim.

11      First, to the extent petitioner contends that the trial court violated state law,

12  his claim is not cognizable on federal habeas review.  See Estelle, 502 U.S. at 71-

13  72 ("[T]he fact that the instruction was allegedly incorrect under state law is not a

14  basis for habeas relief."); Van Pilon v. Reed, 799 F.2d 1332, 1342 (9th Cir. 1986)

15  (claims that merely challenge correctness of jury instructions under state law

16  cannot reasonably be construed to allege a deprivation of federal rights) (citation

17  omitted).

18      Second, to the extent petitioner argues that the trial court's ruling deprived

19  him of a meaningful opportunity to present a defense, petitioner is not entitled to

20  habeas relief because he cites no Supreme Court decision which clearly establishes

21  that the Due Process Clause is violated when a state trial court fails adequately to

22  instruct the jury on a defense theory.[16]  See infra note 17.  There is Ninth Circuit

23  precedent that such an instructional error might present a federal constitutional

24  issue to the extent the error "deprive[d] the defendant of his due process right to

25

26      [16]As respondent argues (Answer at 11-15), in the absence of such authority, finding a

27  constitutional right to a jury instruction on an affirmative defense would require the application

28  of a new rule of law, an exercise this Court may not undertake in a habeas proceeding.  Teague v. Lane, 489 U.S. 288 (1989).

1   present a defense." <u>Bradley v. Duncan</u>, 315 F.3d 1091, 1098-99, 1101 (9th Cir.

2   2002) (stressing that "the right to present a defense would be empty if it did not

3   entail the further right to an instruction that allowed the jury to consider the

4   defense.") (citing, in pertinent part, <u>Mathews v. United States</u>, 485 U.S. 58 (1988);

5   and <u>California v. Trombetta</u>, 467 U.S. 479 (1984)), <u>cert. denied</u>, 540 U.S. 963

6   (2003).  Recent decisions, however, question whether such a rule can still be

7   considered "clearly established" federal law on federal habeas review.[17]  <u>See, e.g.</u>,

8

9   ───────────────

10  [17]It appears that the rule announced in <u>Bradley</u> was originally gleaned from "principles previously enunciated by [the] Supreme Court" primarily in <u>Mathews</u> and <u>Trombetta</u>.  <u>See</u>

11  <u>Bradley</u>, 315 F.3d at 1098-99, 1101 (citations omitted).  In <u>Mathews</u> – a case upon which

12  petitioner relies – the Supreme Court stated "[a]s a general proposition a defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a

13  reasonable jury to find in his favor."  <u>Mathews</u>, 485 U.S. at 63 (citations omitted).  Nothing in <u>Mathews</u>, however, suggests that the Supreme Court derived this "general proposition" from any

14  provision of the United States Constitution.  <u>See id.</u> at 59-66; <u>see also id.</u> at 69 (White, J., dissenting) ("The Court properly recognizes that its result is not compelled by the Constitution");

15  <u>Liu v. Mitchell</u>, 2007 WL 642956, *8 (S.D. Cal. Feb. 23, 2007) ("[<u>Mathews</u>] did not identify a constitutional clause as a source of its holding . . .").  Indeed, <u>Mathews</u> was a direct appeal from a

16  federal criminal conviction in which the Court simply interpreted the federal law of entrapment under federal court rules and "[f]ederal appellate cases."  <u>Mathews</u>, 485 U.S. at 59, 63-64.

17  <u>Trombetta</u> held that "the Due Process Clause of the Fourteenth Amendment . . . require[s] that criminal defendants be afforded a meaningful opportunity to present a complete defense.").

18  <u>Trombetta</u>, 467 U.S. at 485.  The Supreme Court has subsequently noted, however, that the Court's prior cases involving the right to present a complete defense arose solely in the context

19  of exclusion of evidence or testimony of defense witnesses – not the right to have the jury

20  instructed on affirmative defenses.  <u>Gilmore</u>, 508 U.S. at 343 (citing cases including <u>Crane v. Kentucky</u>, 476 U.S. 683, 690 (1986), upon which petitioner relies, along with <u>Mathews</u> (Reply at

21  8-9)).  In fact, <u>Gilmore</u> pointedly rejected propositions that (a) "the right to present a defense includes the right to have the jury consider it," and (b) that "prevent[ing] a jury from considering

22  an affirmative defense" violates due process.  <u>Gilmore</u>, 508 U.S. at 344.  The Court in <u>Gilmore</u> reasoned that such an "expansive reading of [Supreme Court] cases would make a nullity of the

23  rule reaffirmed in <i>Estelle v. McGuire</i> . . . that instructional errors of state law generally may not form the basis for federal habeas relief."  <u>Id.</u>  Moreover, the Supreme Court has cautioned against

24  using Ninth Circuit precedent on habeas review to "refine or sharpen a general principle of

25  Supreme Court jurisprudence into a specific legal rule that [the Supreme Court] has not

26  announced."  <u>Lopez v. Smith</u>, 135 S. Ct. 1, 4 (2014) (per curiam) (citation and internal quotation marks omitted); <u>see also</u> <u>White v. Woodall</u>, 134 S. Ct. 1697, 1706 (2014) (if habeas court must

27  (continued...)

28

17

1   <u>Perez v. McEwen</u>, 2013 WL 4537271, *11 (C.D. Cal. Aug. 27, 2013) (observing

2   that Ninth Circuit authority which treats <u>Mathews</u> standard as "clearly established

3   Supreme Court precedent" under the Antiterrorism and Effective Death Penalty

4   Act ("AEDPA") is "not without doubt") (citations omitted); <u>Liu v. Mitchell</u>, 2007

5   WL 642956, *8 (S.D. Cal. Feb. 23, 2007) (questioning whether rule that a criminal

6   defendant has a "right to adequate jury instructions on her theory of the case" is

7   "clearly established Supreme Court authority" that could justify federal habeas

8   relief).  Where, like here, the Supreme Court has not "squarely established" a legal

9   rule that governs "the specific question presented by [a] case," it cannot be said

10  that a state court's adjudication of that question unreasonably applied "clearly

11  established" federal law.  <u>See</u> <u>Woods v. Donald</u>, 135 S. Ct. 1372, 1377 (2015)

12  ("Because none of [the Supreme Court's] cases confront 'the specific question

13  presented by this case,' the state court's decision could not be 'contrary to' any

14  [Supreme Court] holding[.]") (citing <u>Lopez v. Smith</u>, 135 S. Ct. 1, 4 (2014) (per

15  curiam)); <u>Knowles v. Mirzayance</u>, 556 U.S. 111, 122 (2009) (holding that "it is

16  not 'an unreasonable application of clearly established Federal law' for a state

17  court to decline to apply a specific legal rule that has not been squarely established

18  by [the Supreme] Court"); <u>see also</u> <u>Wright v. Van Patten</u>, 552 U.S. 120, 126

19  (2008) (per curiam) (denying habeas relief where Supreme Court cases provided

20  "no clear answer to the question presented") (citations omitted); <u>Brewer v. Hall</u>,

21  378 F.3d 952, 955 (9th Cir.) (citation omitted), <u>cert. denied</u>, 543 U.S. 1037 (2004).

22       Third, even assuming the Supreme Court had clearly established that a

23  defendant is constitutionally entitled to jury instructions on his theory of the

24  defense, petitioner still is not entitled to federal habeas relief.  To the extent

---

26       [17](...continued)

27  extend a rationale underlying specific Supreme Court precedent before it can apply to facts in a
    subsequent case, then by definition, the rationale was not "clearly established at the time of the

28  state-court decision") (quoting <u>Yarborough</u>, 541 U.S. at 666).

18

petitioner contends that the trial court denied him a meaningful opportunity to present a complete defense when it refused his request to modify CALCRIM No. 3402, petitioner's claim lacks merit as he has not shown that the trial court committed an error under state law, much less one of constitutional magnitude. Here, the Court of Appeal reasonably concluded that California law does not require a trial court to instruct the jury that "the defense of duress could be predicated on a fear of great bodily injury separate from a fear of life endangerment." (Lodged Doc. 3 at 12). As the Court of Appeal noted, the California statute upon which the duress defense is based "does not mention the fear of great bodily injury, but limits its application [to] those who have 'reasonable cause to and did believe their lives would be endangered if they refused.'" (Lodged Doc. 3 at 12) (citing Cal. Penal Code § 26(6)). Moreover, the Court of Appeal recognized that a similar argument had previously been rejected in California:

> In *People v. Subielski* (1985) 169 Cal. App. 3d 563 (*Subielski*), the court rejected an argument analogous to the one on which [petitioner] relies – that the affirmative defense of duress was available based on a defendant's "honest but unreasonable belief that he would suffer physical injury." (*Id.* at p. 567.) The *Subielski* court concluded there was no authority in support of the defense theory because duress "requires a reasonable fear for one's life," but the defendant "only feared that he might be subjected to a physical beating if he did not participate." (*Ibid.*)

> [Petitioner] acknowledges that *Subielski* makes duress unavailable to defendants who present nothing more than a fear of a physical beating, but asserts he presented evidence that he feared more than a beating – specifically, he feared a retributive shooting.

///

1        We find that distinction unpersuasive because the rationale for

2    the *Subielski* holding was that the affirmative defense of duress must

3    be premised on a reasonable fear that one's life is endangered.

4    (*Subielski*, *supra*, 169 Cal. App. 3d at p. 567.)  Therefore, a fear of

5    injury that does not rise to that level will not support the defense,

6    regardless of whether the fear is premised on a physical beating or a

7    shooting.

8    (Lodged Doc. 3 at 12).  This Court is bound by the Court of Appeal's

9    determination that under California state law, the affirmative defense of duress

10   must be premised on a reasonable fear that one's life is endangered as opposed to

11   a reasonable fear that one may suffer great bodily injury, and that, accordingly, the

12   trial court's CALJIC No. 3402 instruction was consistent with state law.  See

13   Waddington, 555 U.S. at 192 n.5 ("we have repeatedly held that it is not the

14   province of a federal habeas court to reexamine state-court determinations on

15   state-law questions") (citation and internal quotation marks omitted); Bradshaw v.

16   Richey, 546 U.S. 74, 76 (2005) ("a state court's interpretation of state law,

17   including one announced on direct appeal of the challenged conviction, binds a

18   federal court sitting in habeas corpus"); Hicks v. Feiock, 485 U.S. 624, 630 n.3

19   (1988) (federal habeas court may not disregard intermediate appellate state court's

20   interpretation of state law unless the federal court "is convinced by other

21   persuasive data that the highest court of the state would decide otherwise")

22   (citation and quotation marks omitted).

23       Fourth, even assuming that a duress defense in California could be

24   predicated on a defendant's fear of great bodily injury, the Court of Appeal

25   reasonably determined that petitioner was not entitled to an instruction under such

26   a theory because substantial evidence did not support it:

27       [U]nder the facts of this case, it is difficult to imagine how

28   inclusion of the "great bodily injury" alternative would have been

20

justified or helpful.  [Petitioner] testified that he initially went on the "mission" to shoot an Aztlan member because the older M.S. members pressured him to do so – if he refused, "they would shoot [him]."  He also testified that he went along with Corrupt because he "was scared that if [he] ran away [Corrupt] might shoot [him]."  As the Attorney General points out, a reasonable person would consider the prospect of receiving a gunshot wound something that would place one's life in danger.

[Petitioner] counters that because he had previously received a nonfatal gunshot wound, his fear might not have risen to the level of life endangerment.  However, not only did [petitioner] fail to testify as to such a limited fear (or make that argument below), but the distinction would have been entirely artificial.  Indeed, in *Otis*, *supra*, 174 Cal. App. 2d 119, Justice Tobriner explained that such a distinction was psychologically unrealistic, noting that it was not resolved whether fear of "bodily harm," rather than "fear that the person's life would be endangered," would suffice to support the defense of duress. (*Id.* at p. 123.)  However, "precision in separating [the two types of fear] has become somewhat unrealistic in the light of recent psychological research," which "at least throws some doubt on the extreme niceties of these legal distinctions between fear of serious bodily harm and fear of life itself."[18] (*Id.* at pp. 124-125.) That kind of doubt would have been especially acute here, given that [petitioner] would have to argue that he feared getting shot in such a manner that his life would not be in danger.

---

[18]"The *Otis* court did not find it necessary to resolve the legal question of whether duress could be premised on a fear of injury because the jury instruction at issue "failed to incorporate the element of immediacy of danger."  (Lodged Doc. 3 at 13 n.11) (citation omitted).

(Lodged Doc. 3 at 12-13) (footnote in original).  The Court of Appeal's findings are reasonably supported by the record, and are thus presumed correct.  <u>See</u> 28 U.S.C. § 2254(e)(1);  <u>Lambert v. Blodgett</u>, 393 F.3d 943, 972 (9th Cir. 2004), <u>cert. denied</u>, 546 U.S. 963 (2005); <u>Taylor v. Maddox</u>, 366 F.3d 992, 1000 (9th Cir.), <u>cert. denied</u>, 543 U.S. 1038 (2004).

Finally, even assuming a constitutional error occurred, this Court cannot grant habeas relief unless petitioner suffered prejudice under <u>Brecht</u>.  <u>Merolillo v. Yates</u>, 663 F.3d 444, 454-55 (9th Cir. 2011), <u>cert. denied</u>, 133 S. Ct. 102 (2012). Here, however, it is apparent that the asserted instructional error did not have a substantial and injurious effect or influence in determining the jury's verdict.  As the Court of Appeal explained:

> The trial testimony presented the jury with two alternatives: either [petitioner] took part in the shooting out of fear that Corrupt or other M.S. members would shoot him if he refused, as he testified, or that there was no reasonable basis for fear of anything more than a beating in light of his youth and inexperience, as the prosecution expert testified.  There was no evidence that [petitioner] actually feared a non-life-threatening retributive shooting for his failure to complete the mission, much less any evidence that he had reason for such a fear.

(Lodged Doc. 3 at 13-14).  This Court agrees with the findings and analysis of the Court of Appeal and concludes that the asserted instructional error did not have a substantial and injurious effect or influence in determining the jury's verdict.

The California courts' rejection of petitioner's jury instruction claim was not contrary to, or an objectively unreasonable application of, any clearly established federal law.  Nor was it based on an unreasonable determination of the facts in light of the evidence presented.  Accordingly, petitioner is not entitled to federal habeas relief on this claim.

## B.   Petitioner's Evidentiary Claim Does Not Merit Habeas Relief

Liberally construed in light of petitioner's briefing on direct appeal, the Petition appears to assert that the trial court erred under state law (*i.e.*, Cal. Evid. Code § 801 ("Expert witnesses; opinion testimony")) and deprived petitioner of his federal constitutional rights when it permitted Detective Urena to opine that it was unlikely M.S. gang members would have killed petitioner for refusing to shoot Favela ("challenged testimony") – an opinion that assertedly was outside the witness' "field of expertise" and, in any event, was unnecessary since it involved inferences and conclusions which the jury could just as easily have drawn based on common experience.  (Petition at 5; Reply at 11-14; see Lodged Doc. 1 at 32-40).  The California Court of Appeal – the last state court to render a reasoned decision on this issue – rejected petitioner's claim on its merit.  (Lodged Doc. 3 at 14-18).  Petitioner is not entitled to habeas relief on this claim.

### 1.   Background[19]

During cross-examination, defense counsel asked Detective Urena what the punishment would be for a gang member who did not complete a gang mission. The detective opined that it would range from being ostracized to being "jumped out" of the gang and receiving a beating – but it could even include the murder of that person.  Counsel followed up by asking whether a gang member's backing out of a "serious situation, like a homicide" would call for consequences worse than merely being "jumped" out of the gang.  The gang expert replied, "they could be, but I think in this case we know what the consequences were and they didn't appear that bad."

On redirect examination, the prosecutor asked whether petitioner's failure to complete his gang assignment by shooting Favela would be treated in the same

---

[19]The facts set forth in this section are drawn from the California Court of Appeal's decision on direct appeal.  (Lodged Doc. 3 at 14-18).  Such factual findings are presumed correct. 28 U.S.C. § 2254(e)(1).

1  way as the situation in which a gang member would be killed for trying to leave

2  the gang.  Detective Urena stated that it would not.  When the prosecutor asked

3  Urena to explain, defense counsel objected on the ground that the question called

4  for an improper expert opinion because the subject matter was outside the witness'

5  "field of expertise" and was, in any event, one of "common knowledge."  The trial

6  court overruled the objection.  Detective Urena explained that because petitioner

7  was relatively young (16 years old), petitioner had been a gang member for only

8  nine months, and he had not carried out any significant violent acts for the gang in

9  the past, he would not be considered a threat by the gang.  "And so taking his life

10 was probably not the probable consequence of not having carried through with the

11 acts."  Urena opined that death would be a likely consequence if the person

12 leaving a gang was a "hard core" member who had committed many crimes and,

13 therefore, had damaging information about other gang members.  Over the same

14 defense objection, Detective Urena also testified that a gang member in

15 petitioner's position would "open himself up to a beating by the gang, but not

16 likely to be killed by the gang."

17                    **2.    Pertinent Law**

18      "A habeas petitioner bears a heavy burden in showing a due process

19 violation based on an evidentiary decision."  Boyde v. Brown, 404 F.3d 1159,

20 1172 (9th Cir.), as amended on reh'g, 421 F.3d 1154 (9th Cir. 2005).  "The

21 admission of evidence does not provide a basis for habeas relief unless it rendered

22 the trial fundamentally unfair in violation of due process."  Johnson v. Sublett, 63

23 F.3d 926, 930 (9th Cir.), cert denied, 516 U.S. 1017 (1995) (citation omitted); see

24 also Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009) (discussing

25 standard; noting that the Supreme Court has not made a clear ruling that admission

26 of irrelevant or overtly prejudicial evidence constitutes a due process violation

27 sufficient to warrant issuance of a writ of habeas corpus).  The "[a]dmission of

28 evidence violates due process only if there are *no* permissible inferences the jury

24

may draw from it."  Boyde, 404 F.3d at 1172 (quoting Jammal v. Van de Kamp, 926 F.2d 918, 919 (9th Cir. 1991)) (internal quotation marks omitted; emphasis in original).

In addition, habeas relief is available for evidentiary error only when a petitioner demonstrates that he suffered prejudice as a result of the due process violation – that is, that the error had "'a substantial and injurious effect' on the verdict."  Dillard v. Roe, 244 F.3d 758, 767 n.7 (9th Cir.) (quoting Brecht, 507 U.S. at 623), cert. denied, 534 U.S. 905 (2001).

### 3.    Analysis

Petitioner is not entitled to federal habeas relief on his instant evidentiary claim.

First, to the extent petitioner argues that the admission of Detective Urena's testimony violated California Evidence Code section 801, or any other state law, his claim is not cognizable on federal habeas review.  See Larson v. Palmateer, 515 F.3d 1057, 1065 (9th Cir.) (whether trial court's admission of evidence was correct under state law "irrelevant" on federal habeas review) (citation omitted), cert. denied, 555 U.S. 871 (2008); see also 28 U.S.C. § 2254(a) (federal habeas corpus relief may be granted "only on the ground that [petitioner] is in custody in violation of the Constitution or laws or treaties of the United States."); Estelle, 502 U.S. at 68 ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.  In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States.").

Second, petitioner has not shown that admission of the challenged testimony was erroneous under state law, much less that it rendered the trial fundamentally unfair in violation of due process.  In California, gang expert testimony has been held admissible on a number of subjects, including the motivation for a particular crime and the "culture and habits" of a particular criminal street gang.  See People

1    v. Killebrew, 103 Cal. App. 4th 644, 657 (2002) (citing cases), disapproved of on
2    other grounds by People v. Vang, 52 Cal. 4th 1038, 1047-49 (2011); People v.
3    Gardeley, 14 Cal. 4th 605, 617 (1996) (gang expert's testimony concerning "[t]he
4    subject matter of the culture and habits of criminal street gangs" based on the
5    expert's professional experience admissible as opinion evidence under Cal. Evid.
6    Code § 801), cert. denied 522 U.S. 854 (1997), habeas corpus denied, 1999 WL
7    672320 (N.D. Cal. Aug. 24, 1999).

8        Here, the Court of Appeal determined that Detective Urena's challenged
9    testimony was properly admitted under state law as expert opinion on "the manner
10   in which [the M.S.] criminal street gang engaged in self-policing its wayward
11   members." (Lodged Doc. 3 at 16).  The Court of Appeal explained:

12           Contrary to [petitioner's] assertion, the challenged evidence
13       falls within the general rule that testimony concerning the culture and
14       habits of criminal street gangs meets the criteria for the admission of
15       expert testimony because such evidence is sufficiently beyond
16       common experience that the opinion of an expert would assist the
17       trier of fact.  [Citations] . . . .  Detective Urena's expert opinion did
18       not "consist[ ] of inferences and conclusions which can be drawn as
19       easily and intelligently by the trier of fact as by the witness."
20       [Citation].  Neither the range of internal punishments typically
21       imposed for a gang member's failure to follow orders – much less the
22       situations in which a particular punishment will likely be imposed for
23       a given misstep – are matters of common knowledge.

24           [Petitioner's] reliance on People v. Page (1991) 2 Cal. App. 4th
25       161 (Page) is therefore misplaced.  In Page, the trial court permitted
26       an expert social psychologist to outline "the factors which might
27       influence a person to give a false statement or confession during an
28       interrogation," but excluded expert testimony as to how those factors

26

1  applied to the circumstances of the case. (*Id*. at p.189.) The *Page*

2  court found no abuse of discretion in the trial court's limitation:

3  "Having been educated concerning those factors, the jurors were as

4  qualified as the professor to determine if those factors played a role in

5  Page's confession, and whether, given those factors, his confession

6  was false." (*Ibid*.) Detective Urena's challenged testimony, in

7  contrast, did not rely on a scientifically derived set of factors that

8  could be readily applied by a layman. Rather, he testified as to a

9  matter of specialized knowledge – the manner in which a criminal

10  street gang engaged in self-policing its wayward members.

11  Nor is [petitioner] correct that there was inadequate foundation

12  as to Detective Urena's knowledge as to a gang's approach to

13  self-policing. The detective testified as to his academic study of

14  gangs, as well as his gang-related studies at the police academy. As a

15  police officer, Detective Urena worked with gang officers who

16  instructed him on "the street level operations of gangs." As a member

17  of a gang unit, the detective "made hundreds of contacts with gang

18  members," providing him with "the opportunity to question them and

19  find out their method of operation." He had 15 years of experience as

20  a police officer, including assignments in gang units. The detective

21  was "somewhat" familiar with the M.S. gang. There was sufficient

22  foundation of the detective's specialized knowledge of gang

23  operations to provide adequate foundation for his opinion. To the

24  extent that knowledge might be deemed wanting, it merely went to

25  the testimony's weight, not its admissibility.

26  (Lodged Doc. 3 at 16-17). The factual findings of the Court of Appeal are

27  reasonably supported by the record, and thus presumed correct. See 28 U.S.C.

28  § 2254(e)(1); Lambert, 393 F.3d At 972; Taylor, 366 F.3d at 1000.

27

1      Testimony that M.S. gang members were unlikely to kill petitioner for

2 refusing to shoot Favela was probative on the issue of whether petitioner

3 participated in the August 8 shooting because he believed that his life was in

4 immediate danger – and, therefore, was directly relevant to petitioner's duress

5 defense. As there were permissible inferences the jury could draw from the

6 challenged testimony, it was not objectively unreasonable for the Court of Appeal

7 to conclude that the admission of such evidence did not violate due process.

8 Nothing in the record suggests that such properly admitted evidence otherwise

9 rendered the trial fundamentally unfair or violated due process.

10      Finally, as noted above, even assuming a constitutional error occurred, this

11 Court cannot grant habeas relief unless the error was prejudicial. See Merolillo,

12 663 F.3d at 454-55. Here, it is apparent that the asserted evidentiary error did not

13 have a substantial and injurious effect or influence in determining the jury's

14 verdict. As the Court of Appeal explained:

15      [T]he prosecution's other gang expert offered similar

16      testimony, without objection. Officer Marquez testified that if a

17      younger gang member was given a mission to shoot someone and he

18      failed to carry it out, the gang member would suffer some kind of

19      punishment, likely a beating. Failure to take part in a gang-ordered

20      shooting would be considered very "severe" and could result in a

21      "death warrant." On redirect examination, the expert testified that he

22      would not expect that a young, inexperienced gang member would be

23      ordered killed in circumstances like those in which [petitioner] failed

24      to shoot Favela. It would be more likely that he would receive a

25      beating. As Detective Urena's challenged testimony added little to

26      Officer Marquez's expert testimony, there is no reason to think that

27      the former had a substantial effect on the verdicts.

28 (Lodged Doc. 3 at 17). This Court is likewise not persuaded that the admission of

1  Detective Urena's testimony, even if erroneous, had a substantial and injurious
2  effect or influence in determining the jury's verdict.

3  The California courts' rejection of petitioner's evidentiary claim was not
4  contrary to, or an objectively unreasonable application of, any clearly established
5  federal law.  Nor was it based on an unreasonable determination of the facts in
6  light of the evidence presented.  Accordingly, petitioner is not entitled to habeas
7  relief on this claim.[20]

8  **VI.   ORDERS**

9  IT IS THEREFORE ORDERED:  (1) the Petition is denied and this action is
10 dismissed with prejudice; and (2) Judgment shall be entered accordingly.[21]

11 DATED:  March 29, 2016                    /s/

12                                         Honorable Jacqueline Chooljian
13                                         UNITED STATES MAGISTRATE JUDGE

14 _____

15 [20]To the extent petitioner, through the declaration attached to the Petition, intends to raise
16 additional claims – *i.e.*, that he was "sentenced under double punishment" in violation of his
   rights to "due process and equal protection" and was denied effective assistance of counsel in
   unspecified respects – such claims are conclusory and are rejected on that basis.  See Jones v.
17 Gomez , 66 F.3d 199, 204-05 (9th Cir. 1995) (conclusory allegations not supported by statement
18 of specific facts do not warrant habeas relief), cert. denied , 517 U.S. 1143 (1996); James v.
   Borg, 24 F.3d 20, 26 (9th Cir. 1994) ("Conclusory allegations which are not supported by a
19 statement of specific facts do not warrant habeas relief.") (citation omitted), cert. denied, 513
20 U.S. 935 (1994).  To the extent petitioner asserts that this Court is obligated to "conduct a review
   of the entire record for plain and structural errors that were not raised" (Reply at 14), he is
21 incorrect as it is petitioner's obligation to specify in the Petition itself "all the grounds for relief
22 available to [him]" and "state the facts supporting each ground."  See Rule 2(c) of the Rules
   Governing Section 2254 Cases in the United States District Courts.

23 [21]Petitioner's request for an evidentiary hearing (Reply at 3) is denied because he has not
24 alleged any material fact which he did not have a full and fair opportunity to develop in state
   court and which, if proved, would show his entitlement to habeas relief.  See Cullen v.
25 Pinholster, 563 U.S. 170, 180-81 (2011) (scope of record for 28 U.S.C. § 2254(d)(1) inquiry
26 limited to record that was before state court that adjudicated claim on the merits); Schriro v.
   Landrigan, 550 U.S. 465, 474 (2007) (if record refutes applicant's factual allegations or
27 otherwise precludes habeas relief, court not required to hold evidentiary hearing); Gandarela v.
   Johnson, 286 F.3d 1080, 1087 (9th Cir. 2002) (evidentiary hearing properly denied where the
28 petitioner "failed to show what more an evidentiary hearing might reveal of material import"),
   cert. denied, 537 U.S. 1117 (2003).